IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

JULIUS HOBBS,

     Plaintiff,

vs.                                        Case No.:

FLORIDA SUPREME COURT, FLORIDA
BOARD OF BAR EXAMINERS, AND
MICHELLE A. GAVAGNI, in her official capacity

     Defendant.

_____/

## **COMPLAINT**

       COMES NOW, Plaintiff, JULIUS HOBBS, by and through his undersigned counsel, sues the Defendants, THE FLORIDA SUPREME COURT by and through its administrative agency, the FLORIDA BOARD OF BAR EXAMINERS ("FBBE") and MICHELLE A. GAVAGNI, in her official capacity as Executive Director of the Florida Board of Bar Examiners (collectively "Defendants") and states as follows

**The Parties**

1. The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 for the Plaintiff's claims under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 CFR Part 35 (hereinafter, the "ADA") and § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 et seq. (hereinafter, the "Rehabilitation Act").

2. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) because (b) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring within this judicial district.

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

3. Plaintiff, JULIUS HOBBS (hereinafter "HOBBS") is a resident of the State of Florida, a person with a disability under the Americans with Disabilities Act and the Rehabilitation Act of 1973, and is otherwise *sui juris*.

4. The Florida Supreme Court is established by Article V, Section 3 of the Florida Constitution, and has exclusive jurisdiction to regulate the admissions of persons to the practice of law. The Florida Supreme Court reviews, approves, and promulgates The Rules of the Supreme Court Relating to Admissions to the Bar.  Although the Florida Board of Bar Examiners assists the Supreme Court in carrying out its functions, ultimately defendant The Florida Supreme Court is responsible for questions, rules, policies and procedures relating to the admission of lawyers in the State of Florida.

5. The Florida Board of Bar Examiners ("FBBE") is an administrative agency of The Florida Supreme Court created by the Court to implement promulgates The Rules of the Supreme Court Relating to Admissions to the Bar.  The Defendant FBBE is a "public entity" within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(1)

6. MICHELLE A. GAVAGNI (the "Executive Director"), in her official capacity is responsible for FBBE's actions or omissions to act. Collectively, the Executive Director, FLORIDA SUPREME COURT and FBBE will be collectively referred to as FBBE.

7. FBBE receives Federal Financial Assistance and Federal Grants in the amount of $ 9,509,801 for the Fiscal Year 2017 and 2018, and is therefore subject to the requirements of Section 504 the Rehabilitation Act of 1973.

8. At all times pertinent to this Complaint, Plaintiff was a qualified individual with a disability as HOBBS has a (A) a mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; and (C) the Defendants

regard him as having such an impairment. HOBBS lives with Adjustment disorders with mixed anxiety and depressed mood, and alcohol use disorder. Further, Defendants regard HOBBS as an alcoholic, despite having been rehabilitated successfully, and no longer engaging in such abuse;

BACKGROUND AND FACTS:

9.  During high school, HOBBS decided that he wanted to be a member of the U.S. Army. This decision led to an ROTC scholarship.

10. On May 10, 2003, HOBBS graduated from the University of Tampa with a degree in Criminology and was commissioned through their ROTC program as a U.S. Army engineer officer.

11. HOBBS decided that he wanted to be a career Army officer; HOBBS wanted to be a combatant and he wanted to lead troops.

12. During his time in the Army, HOBBS worked in many plans and operations shops where he helped develop daily and future operations for our unit and subordinate elements. HOBBS also spent 37 total months in combat zones where he led a platoon in Iraq, planned missions and coordinated resources for a team in Afghanistan, and worked with other branches of the military and government agencies in the Counter Improvised Explosive Device cell where he studied, assessed and mitigated these devices in Iraq.

13. HOBBS final position in the Army was as a company commander where he was responsible for leading, training and preparing approximately 175 soldiers for combat operations in Afghanistan.

14. HOBBS has been awarded the following medals: Bronze Star (three times), Army Commendation Medal, Army Achievement Medal (two times), Meritorious Unit

Commendation, National Defense Service Medal, Afghanistan Campaign Medal with two campaign stars, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Medal, Iraq Campaign Medal with Campaign Star, Army Service Ribbon, Overseas Service Ribbon (three times); NATO Medal, Combat Action Badge, Pathfinder Badge, Parachutist Badge.

15. Since 2008, the United States Department of Defense (US DOD) has strongly endorsed that all personnel should seek professional help to address all health-related concerns, either mental or physical.  The US DOD recognized the critical importance of mental health and supported proactive management of mental health conditions, wellness and recovery.  If a soldier has experienced a mental health condition, the US DOD believes that the soldier may benefit from mental health treatment and support, because left untreated, mental health conditions may affect an individual's judgment, reliability, and trustworthiness.

16. As an officer and later a commander responsible for making 175 soldiers ready for deployment to Afghanistan, HOBBS was trained to encourage his troops to seek treatment and counseling for issues that affect mental health and reinforce the idea that utilization of mental health treatment options is a positive course of action.  HOBBS was well aware of the US DOD's policies on encouraging mental help, discussed mental health resources with his troops, and the notices for resources and help lines were ubiquitous at Ft. Benning, Ft. Stewart, as well as in combat operations.

17. The US DOD adopted this proactive response towards help-seeking behaviors as civilian personnel and service members avoided or delayed seeking mental health counseling or treatment because they were concerned that doing so would jeopardize their security

clearance, or that personnel security officials and commanders would question their judgment or stability later.

18. Since 2000, HOBBS has held national security clearances at the secret level, and with such clearances, he was able to hold his position as an officer in the Counter Improvised Explosive Device cell. This security clearance was renewed in 2011.

19. In fact, the U.S. DOD views help-seeking behaviors for wellness and recovery as favorably impacting eligibility for sensitive national security positions. Failure to seek care when needed actually increases the likelihood that psychological distress may escalate to a more serious mental condition, which in turn, could cause behaviors that would be of security concern.

    A. For example, in the application for a national security position, a question asks whether "you have consulted with a health care provider regarding an emotional or mental health condition, or were hospitalized for such a condition, within the seven years prior to filling out the [application]."

    B. If the answer is "yes", the investigative officer may ask the health care professional if the applicant could impair his or her judgment, reliability, or ability to properly safeguard classified national security information. The question is to determine if the underlying condition that led to consultation with the health care professional is relevant to the adjudication for eligibility for access to classified information or a sensitive national security position. If the health care professional answers, "no" to this question, no further questions are authorized.

20. As a result of ten years in the military, HOBBS was encouraged to seek help when needed, and that mental health professionals were on staff and were always available

21. HOBBS had a misdemeanor DUI arrest in 2006 and in 2012.  As a result of the DUI in 2012, HOBBS' superior recommended that he see a mental health counselor and he did so.

22. After 10 years of service, HOBBS separated from the military for family reasons. He was seeking custody of his son and decided that being a constant and active participant in his son's life was a main priority.

23. While HOBBS was in the military, he saw himself making a difference by defending the nation and the ideals of the Constitution of the United States through fire and maneuver. HOBBS would like to continue this service as an attorney with the vital mission to defend the ideals in the Constitution, better understand the construct of, and make a difference in our society.

24. As a result of three tours of duty, HOBBS lives with Adjustment disorders with mixed anxiety and depressed mood, and alcohol use disorder.  An Adjustment Disorder is a stress-related condition caused by years of battlefield stress that results in chronic depression.

25. In 2015, as a result of acclimating to civilian life, the stress that was a result of his custody lawsuit and a recent romantic relationship that had unexpectedly terminated, HOBBS adjustment disorder developed into a severe depressive episode where HOBBS used alcohol.

26. HOBBS remembered his training and reached out to the Veterans Administration for help, and he received five months of psychotherapy sessions to cope with the issues that he had.

27. HOBBS applied to law school, in March 2016, and was accepted at Western Michigan University Cooley School of Law in Tampa, Florida, beginning in the fall of 2016.

**The Florida Board of Bar Examiners**

28.  To practice law in the State of Florida, an individual must be a member of the Florida State Bar Association (the "Florida Bar").

29.  The FBBE maintains rules, policies and procedures that endow the FBBE with the ability to screen applicants with any mental health condition or disability, and place conditions on the admission of persons with mental disabilities.

30.  FBBE believes that they are required to assess mental health of each applicant.

31.  The FBBE considers satisfactory mental health to include: (1) the current absence of an untreated, uncontrolled mental illness that impairs or limits an applicant's ability to practice law in a competent and professional manner; and (2) the unlikelihood of a relapse of such a prior mental illness.

32.  To seek admission to the Florida Bar, an applicant must produce satisfactory evidence of good moral character, and adequate knowledge of the standards and ideals of the profession, and proof that the applicant is otherwise fit to take the oath and to perform the obligations and responsibilities of an attorney (Rule 2-12).

33.  As part of the standards of the profession, the FBBE considers the following attributes to be potentially disqualifying as indicative of conduct that demonstrates a failing to possess the character or fitness to be a member of the bar: (j) evidence of mental or emotional instability; and (k) evidence of drug or alcohol dependency.  (Rule 3-11)

34.  The questions that screen applicants for admission to the State Bar of Florida who have a history of mental illness is the following questions (the "Questions"):

> 25.      Within the past five years have you ever been diagnosed with, suffered from, or been treated for a mental illness involving a severe thought disorder (including, but not limited to, schizophrenia), a severe mood disorder (including, but not limited to major depressive disorder or bipolar disorder) or substance use disorder (including, but not limited to, abuse of or addiction to/dependence on

alcohol, marijuana, cocaine, or prescription medications)? If yes, identify which of the listed conditions you were diagnosed with, suffered from or were treated for, state the beginning and ending dates of each consultation or treatment period, and state the name and address of the treating doctor(s) or professional(s) who treated you or who made such diagnosis. Also state the name(s) of any medication prescribed for you during treatment. Please direct each such professional and any hospital and/or other facility in which you were treated to furnish to the Board any information or records the Board may request with respect to any hospitalization, consultation, treatment or diagnosis relating to any such listed condition. "Professional" includes a physician, psychiatrist, psychologist, psychotherapist or mental health counselor.

26.     Do you currently (as hereinafter defined) have a mental health condition (not reported above) which in any way impairs or limits, or if untreated could impair or limit, your ability to practice law in a competent and professional manner? If yes, are the limitations or impairments caused by your mental health condition reduced or ameliorated because you receive ongoing treatment (with or without medications) or participate in a monitoring or counseling program? If yes, describe such condition and any treatment or program of monitoring or counseling. "Currently" does not mean on the day of, or even in the weeks or months preceding the completion of this application; rather, it means recently enough so that the condition may have an ongoing impact on your functioning as a licensed attorney.

(Application to Florida Bar, Question 25 and 26, attached hereto as Exhibit "A").

35. If an applicant answers "yes" to one or both of the Questions, he or she will be singled out and set aside for additional scrutiny by the FBBE and required to provide additional information.

36. The FBBE utilizes the Questions and its corresponding investigation to inquire into highly personal and potentially embarrassing confidential information about applicants who do not pose a direct threat to the public.

37. If an applicant claims that he or she has received treatment for mental illness or substance abuse in the past, the FBBE requires production of "clear and convincing evidence of rehabilitation," as well as exemplary conduct following prior transgressions. (Rule 3-13)

38. To determine the nature and severity of the "mental or emotional instability" or "drug and alcohol dependency", the FBBE demands detailed information and records from mental health professionals, as well as take testimony, and seek the production of any additional documents. Rule 3-21.

39. As a matter of practice, policy and procedure, an applicant who answers "yes" to either of the Questions may be required to submit, at his or her own expense, to an evaluation through a mental health professional chosen by the FBBE.

40. As a matter of practice, policy, and procedure, the FBBE will not accept an evaluation or report from the applicant's own treating physician, psychologist, or therapist in lieu of the required evaluation referenced in the preceding paragraph. By giving less weight to the input of an applicant's treating mental health professionals, the Board unnecessarily subjects disabled applicants to additional scrutiny based on speculation, distrust, and false assumptions regarding the veracity of information they are required to submit.

41. Further, the applicant may be requested to appear before the FBBE in an investigative hearing, and pay $250.00 for such hearing, and pay for any transcripts of such hearing. "Investigative hearings will be informal but thorough, with the object of ascertaining the truth," where the rules of evidence are not observed. (Rule 3-22)

42. The FBBE also is empowered to require that an applicant who lives with a mental illness enter into a 'Consent Agreement', for a period of one year to an indefinite period, where a person enters into a conditional admission which requires some or all of the following conditions (all at the expense of the applicant):

    A. The applicant must be engaged in the practice of law in Florida, must live in Florida and must be monitored in Florida during the period of conditional admission.

B. prohibiting use of alcohol and controlled substances;

C. requiring participation in Florida Lawyers Assistance, Inc. (FLA); and,

D. random screenings for alcohol and controlled substances.

E. Consult with a licensed mental health provider at least quarterly, or more frequently as such mental health provider deems necessary,

F. Have the mental health provider submit quarterly reports to the Florida Bar during the entire probationary period;

G. Have the mental health provider immediately notify the Florida Bar if the applicant misses a scheduled appointment without prior rescheduling; and

H. Have the mental health provider submit quarterly sworn statement to The Florida Bar during the entire probationary period attesting to the applicant's compliance with the conditions.

(See Rule 3-22.5(b), 5-15 and FAQ on floridabarexam.org)

43. The Board does not ask applicants with potentially dangerous physical disabilities (including cognitive impairment from diabetes, thyroid disorders or a traumatic neurological event) to disclose details regarding their prior diagnoses, treatment or prognosis. If such questions were necessary to protect the public, the Board would require individuals with potentially harmful physical disabilities to answer them.

**HOBBS Application to the Florida Bar**

44. HOBBS submitted an application to the Florida Bar in the fall of 2016, when he was a first year law student.

45. HOBBS submitted his application for admission to the Florida Bar in the fall of 2016, and provided truthful answers to Question 25 and 26 in the Application.

46. In spite of the overbroad and intrusive nature of the Questions, HOBBS endeavored to answer them completely and honestly, with an error, if any, on the side of over-inclusive answers.

47. HOBBS consulted his treating physician and, although according to his consultation with his physician none of the pre-set, drop-down menu responses fully captured his history, Plaintiff reported a history of "drug or alcohol" abuse between March 2015 and April 2016 in response to Question 25. In response to Question 26, Plaintiff truthfully and accurately reported "No."

48. HOBBS also provided with his application, a letter from Michael Stewart, PhD (his treating physician), dated September 14, 2016, which was written "in support" of HOBBS' eligibility to apply to the bar.

49. The letter detailed the reason and duration for HOBBS' treatment- specifically, that it was a 4-5-month period of voluntary and active engagement in 9 therapy sessions for "Adjustment disorder with mixed anxiety and depressed mood and Alcohol Use Disorder, mild" caused by a situational event.

50. The letter also explained that HOBBS "learned and successfully used coping skills to address mood and alcohol use" and that he "demonstrated significant progress. . . in terms of his employment, social interactions, appl[ication] for school, and appropriate reduction in alcohol use," and concluded that Dr. Stewart "[did] not foresee any deleterious effects on [Mr. Hobbs] participation in the legal profession."

51. HOBBS answers and the supporting letter from Dr. Stewart were sufficient to allow the Board to assess the mental health of HOBBS as an applicant for the Florida Bar, and

further, the response and supporting letter show that HOBBS has satisfactory mental health under the definition supplied by the bar.

52. Dr. Stewart discussed HOBBS significant progress and appropriate reduction in alcohol use as well as his participation in treatment, thereby showing the absence of any current problem, as well as negating the status of a mental disorder that is untreated or uncontrolled.

53. The letter went on to show "the unlikelihood of a relapse of such a prior mental disorder" through Dr. Stewart's statement as a physician familiar with HOBBS, his mental health, and treatment, that he "[does] not foresee any deleterious effects on [HOBBS'] participation in the legal profession."

54. HOBBS answers and the supporting letter from Dr. Stewart are more than sufficient to allow the Board to assess the mental health of HOBBS as an applicant for the Florida Bar. Further, the response and supporting letter show that HOBBS has satisfactory mental health under the definition supplied by the bar.

55. The document submitted by Dr. Stewart proves the current absence of an untreated, uncontrolled mental disorder that impairs or limits an applicant's ability to practice law in a competent and professional manner. Dr. Stewart discuses HOBBS significant progress and appropriate reduction in alcohol use as well as his participation in treatment, thereby showing the absence of any current problem, as well as negating the status of a mental disorder that is untreated or uncontrolled. The final concern, regarding "the applicant's having a history of appropriate treatment is satisfied by Dr. Stewart's recount of his therapy sessions with HOBBS.

56. While HOBBS' initial application should have been sufficient for the Board to process his application, however, in December 2016 the Board instead asked HOBBS to respond to further intrusive questioning, including providing his sobriety date and current support system. See December 5, 2016 Correspondence from FBBE to HOBBS, attached as Exhibit "B."

57. On January 31, 2017, the FBBE required HOBBS to contact the Veterans Hospital where he sought treatment and have his medical records sent directly to the Board. This letter also required Plaintiff to contact his treating physician and "urge a response to the board's inquiry." See January 31, 2017, Correspondence from FBBE to HOBBS, attached as Exhibit "C"

58. HOBBS provided an amendment to his application. In this amendment, HOBBS reported to the FBBE that he had consulted Dr. Stewart in order to answer Questions 25 and 26.

59. HOBBS informed the FBBE that according to his discussions with Dr. Stewart, none of the pre-set options for the drop-down response to question 25 accurately represented him. Relatedly, regarding the sobriety date, HOBBS informed the FBBE that since he was not considered an addict, he did not have a sobriety date, and, as stated in Dr. Stewart's original letter, had not abstained from alcohol, but had reduced his intake to appropriate levels.

60. HOBBS reiterated the situational nature of his need for treatment and his ongoing access to Dr. Stewart as a resource and informed the FBBE that he also relied on his parents and many friends for support.

61. Dr. Stewart also wrote a second letter to the FBBE, dated February 7, 2017. See Exhibit "D"

62. In this letter, Dr. Stewart reiterated the situational nature of HOBBS' mental illness and stated that there "was no evidence of psychosis or other severe mental health concerns."

63. Dr. Stewart also reiterated that HOBBS had "learned and successfully used coping skills to address mood and alcohol use" and reported that HOBBS had remained in contact with him and had provided periodic updates regarding his status and progress.

64. Dr. Stewart stated that in his opinion, "further treatment, monitoring, or supervision is not warranted at this time."

65. The supplemental information provided by HOBBS and his doctor further support his satisfactory mental health and once again, HOBBS' application should have been processed with no further questions.

66. Once again, however, the FBBE asked HOBBS to undergo further scrutiny than his peers and requested that he "agree to undergo an evaluation at the applicant's expense by a board-selected evaluator" or undergo an investigative hearing before the FBBE, by August 17, 2017. See July 14, 2017 Correspondence from DRF to FBBE, attached as Exhibit "E"

67. The Florida Board of Bar Examiners has no direct or reliable evidence to suggest that Plaintiff currently suffers from an untreated or uncontrolled mental disorder that impairs or limits his ability to practice law in a competent, professional manner.

68. The Board has no evidence to suggest that Plaintiff is likely to relapse into addiction or severe depression or that these conditions pose a direct threat to the public.

69. Even though the FBBE has no evidence to suggest that Plaintiff currently poses a direct threat to the public because of alcohol use or depression, the FBBE is requiring Plaintiff to submit to a completely unnecessary "substance abuse evaluation" in order to rule out the

possibility that Plaintiff could suffer from a substance abuse and/or mood disorder. See

May 17, 2017, Notice of Board Action, attached as Exhibit "F"

70. On July 14, 2017, Plaintiff respectfully asked the FBBE, by and through his counsel, to

reconsider its request for a psychiatric and substance abuse evaluation.

71. To date, FBBE has not reconsidered their demands for either a hearing or a psychiatric

examination.

72. On August 15, 2017, HOBBS withdrew his application for admission to the Florida Bar

due to the choice between being interrogated by a mental health professional, or being

interrogated by the FBBE, all at his own expense.

73. By requiring Plaintiff to submit to a psychiatric and substance abuse evaluation, the FBBE

has intentionally subjected Plaintiff to unnecessary, adverse treatment based upon his

perceived disability/disabilities and/or record of disability.

74. HOBBS continues to wish to be a member of the Florida Bar when he completes law school

and passes the Florida Bar exam, but does not wish to be subject to increased scrutiny

solely on account of his disability or be required to pay additional sums or subject to

additional conditions solely on account of his disability.  HOBBS will reapply to become

a member of the Florida Bar when he will no longer be subject to these discriminatory

practices.

75. HOBBS currently maintains a 3.63 grade point average and is looking forward to

maintaining his exemplary grades in law school.

76. As result of the FBBE's eligibility bar, surcharges, and discriminatory behavior described

above, Plaintiff HOBBS suffered and continue to suffer irreparable loss and injury

including, but not limited to humiliation, embarrassment, emotional distress, and deprivation of his right to equal employment opportunities regardless of his disability.

**Knowledge of FBBE of the Discriminatory Effect of their policies and procedures.**

77.  Since the decision in <u>Ellen S. v. Fla. Bd. of Bar Exam'rs</u>, 859 F. Supp. 1489 (S.D. Fla. 1994), the FBBE was aware that questions that impose additional burdens on persons with disabilities may run afoul of the Americans with Disabilities Act.

78. Further, in 2014, for similar conduct that the FBBE is conducting, the Department of Justice found that the State of Louisiana's attorney licensure system discriminated against bar applicants with disabilities by: (1) making discriminatory inquiries regarding bar applicants' mental health diagnoses and treatment; (2) subjecting bar applicants to burdensome supplemental investigations triggered by their mental health status or treatment as revealed during the character and fitness screening process; (3) making discriminatory admissions recommendations based on stereotypes of persons with disabilities; (4) imposing additional financial burdens on people with disabilities; (5) failing to provide adequate confidentiality protections during the admissions process;  and (6) implementing burdensome, intrusive, and unnecessary conditions on admission that are improperly based on individuals' mental health diagnoses or treatment.  As a result, the Supreme Court of Louisiana decided to resolve the complaint with the Department of Justice and cease discriminating based upon perceptions of mental illness.

79. When faced with the settlement between the Department of Justice and the Supreme Court of Louisiana, the FBBE opined that that was merely a settlement and not binding on their behavior.

80. In 2015, the American Bar Association specifically condemned policies similar to that

practiced by the FBBE and adopted a resolution to limit inquiries as follows:

> RESOLVED, That the American Bar Association urges state and territorial bar
> licensing entities to eliminate from applications required for admission to the bar
> any questions that ask about mental health history, diagnoses, or treatment and
> instead use questions that focus on conduct or behavior that impairs an applicant's
> ability to practice law in a competent, ethical, and professional manner.

> FURTHER RESOLVED, That state and territorial bar licensing entities are not
> precluded from making reasonable and narrowly-tailored follow-up inquiries
> concerning an applicant's mental health history if the applicant has engaged in
> conduct or behavior that may otherwise warrant a denial of admission, and a mental
> health condition either has been raised by the applicant as, or is shown by other
> information to be, an explanation for such conduct or behavior.

81. It has been demonstrated consistently for over 20 years that the invasive inquiry into mental

health history dissuades applicants from help seeking behavior, and has been continuously

condemned, most recently in the August 2017 ABA report firm the National Task Force

on Lawyer Well-Being, which looked at the above described military's "Real Warrior"

mental health campaign as a model for the legal profession.

82. Further, the ABA 2016 Survey of Law Student Well-Being found troublesome rates of

alcohol use, anxiety depression, and illegal drug use at law schools across the country.

83. Pursuant to this study, forty two percent of law students needed help for poor mental health

but only half sought it out.  For law students, seventeen percent experienced some level of

depression, fourteen percent experienced severe anxiety, twenty-three percent had mild or

moderate anxiety, and six percent reported serious suicidal thoughts in the past year.

84. As to alcohol use, 43 percent reported binge drinking at least once in the prior two weeks

and nearly one quarter (22 percent) reported binge-drinking two or more times during that

period.  One quarter fell into the category of being at risk of alcoholism for which further

screening was recommended. Further, out of this quarter at risk, only four percent said they had ever received counselling for alcohol or drug issues.

85. The top factors that students reported  as discouraging them from seeking help were concerns that it would threaten their bar admission, job or academic status social stigma, privacy concerns; financial reasons; and belief that they could handle problems on their own, and not having enough time.

86.  This social stigma and effects on job status continues throughout ones legal career and as such, between 21 and 36 percent of practicing lawyers are problem drinkers, and 26 percent, 19 percent, and 23 percent are struggling with some level of depression, anxiety, and stress respectively.

87. Accordingly, we continue to lose the sharpest minds of our profession in Florida, such as Richard Sharpstein or Ervin Gonzales, in part, to the stigma attached to and discouragement from obtaining mental health treatment.

88. Notwithstanding their full and complete knowledge regarding the likelihood of violation of HOBBS' rights under the Americans with Disabilities Act and the Rehabilitation Act of 1973, the FBBE continues to enforce these discriminatory policies and procedures against HOBBS

89. FBBE's discriminatory conduct against HOBBS was deliberate and intentional, and/or in reckless disregard of HOBBS' rights.

90. HOBBS has been obligated to retain the undersigned counsel for the filing and prosecution of this action and is entitled to recover those attorney fees, expert fees, costs and expenses incurred in this case.

## COUNT I – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

91. Paragraphs 1 through 90 are realleged and incorporated as if fully set forth herein.

92. Under Title II of the Americans with Disabilities Act, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

93. Under Title II, a public entity is prohibited from administering "a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. §§35.130(b)(1), (b)(6).

94. Under the regulations pursuant to the ADA, a public entity, such as the FBBE, shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

95. Questions 25 and 26 on the Bar Application and corresponding investigation violates Title II of the ADA by subjecting applicants with mental health histories to further scrutiny because the Board believes that such applicants might pose a direct threat to the public, not because the Board has objective evidence to suggest that the applicants do, in fact, pose such a risk.

96. Questions 25 and 26 violate Title II of the ADA because they substitute an impermissible inquiry into the status of disabled applicants for a proper inquiry into the applicant's

conduct, forcing qualified applicants to reveal highly personal and potentially embarrassing information that is not relevant to their fitness to practice law.

97. Absent specific conduct that raises legitimate questions about an applicant's fitness to practice law, such an inquiry into the applicant's mental health can only be justified by the discriminatory assumption that the prior diagnosis and/or treatment for a mental health disorder, in and of itself, poses a direct threat to the public.

98. Questions 25 and 26 are not rationally related or necessary to the Board's purported obligation to protect the public. If they were, licensed attorneys in the State of Florida would be required to provide similar information as a condition of continued licensure. No such requirement exists.

99. By demanding psychiatric records of treatment, the FBBE unlawfully obtains information that contains information of an extremely personal nature which is irrelevant to the applicant's ability to practice law

100. In the absence of any evidence suggesting that HOBBS is a direct threat to the public, FBBE required HOBBS to submit to the evaluations based on its speculation that HOBBS' diagnosis and treatment may create a risk to the public.

101. By disregarding HOBBS' qualified mental health professionals, and then requiring Plaintiff to submit to a substance abuse and psychiatric evaluation, the FBBE subjected Plaintiff to an unlawful surcharge and embarrassment based merely on its speculative assumption that Plaintiff may pose a risk to the public because of his mental health history.

102. By disregarding HOBBS' qualified mental health professionals, and then requiring Plaintiff to submit to an interrogation during a hearing before the FBBE where they question HOBBS on his disability, the FBBE subjected Plaintiff to an unlawful surcharge

and embarrassment based merely on its speculative assumption that Plaintiff may pose a risk to the public because of his mental health history.

103. Notwithstanding HOBBS can safely practice law despite the existence of past or current mental health issues and has a history of help-seeking behaviors, HOBBS is at risk of being required to submit to "conditional admission" in which he is required to abstain from drinking, participate in a monitoring program and submit to reporting requirements established by the FBBE after being admitted. Non-disabled applicants are not required to participate in this process, which is not necessary or reasonably related to the Board's purported obligation to protect the public.

104. The FBBE policies, practices, and procedures are individually and collectively hostile and discriminatory to individuals with disabilities such as HOBBS. The policies, procedures, and discriminatory actions, referenced above, are unnecessary, overbroad, and not rationally related to the FBBE's purported obligation to protect the public.

105. The lack of rational relation to the practice of law is demonstrated by the fact that the mental health status for applicants for the Florida Bar is vastly different from current members of the Florida Bar that suffer from mental illness or substance abuse. There is no legitimate basis to distinguish an applicant with mental illness or a history of substance abuse pre or post admission to the Florida Bar.

106. At all times pertinent to this Complaint, the Board's discriminatory actions have been willful, intentional, and in conscious disregard for the ADA, as fully set forth herein.

107. As a result of the FBBE's discriminatory acts, Plaintiff has suffered and continues to suffer irreparable damage that cannot be adequately compensated through remedies at law.

108.  An injunction is necessary to balance the hardships, which are grossly disproportionate, as the Board policies are illegal and inconsistent with the purpose and protections of the ADA.

109.  Pursuant to 42 U.S.C. § 12188, this Court is vested with the authority to grant Plaintiff the injunctive relief requested herein.

**WHEREFORE**, Plaintiff, JULIUS HOBBS, respectfully demands judgment against Defendants, THE FLORIDA SUPREME COURT, the FLORIDA BOARD OF BAR EXAMINERS ("FBBE") and MICHELLE A. GAVAGNI, in her official capacity as Executive Director of the Florida Board of Bar Examiners, for following injunctive relief:

A.  Finding that Questions 25 and 26 are unlawful eligibility bars based on disability and Ordering Defendants to cease asking this information solely based on a history of disability instead of conduct that would demonstrate unfitness to practice law;

B.  Finding that the practices relating to the investigation of persons' disabilities is an unlawful eligibility bar, and Ordering Defendants to cease demanding detailed medical documentation of an applicant's psychiatric history, subjecting applicants, who may or may not have their own treating professional, to additional psychiatric examinations, or subject applicants to interrogation at a hearing by the FBBE regarding their mental health.

C.  Finding that the practices subjecting persons with disabilities to additional costs solely because of their disability status, such as costs of investigations, examinations, hearings, and conditional admissions, are discriminatory surcharges based on disability, and ordering defendants to cease surcharging applicants and attorneys because of their disability status.

D.  Finding that HOBBS history of alcohol abuse and mental illness places him at risk for conditional admission, and find that the Defendants' practices regarding conditional admission place unlawful and discriminatory eligibility conditions upon a person with a disabilities right to practice.

E.  Awarding Plaintiff his reasonable costs and attorneys' fees;

F.  Awarding such other relief the Court deems proper; and

G.  Retaining jurisdiction of this case until the Department has fully complied with the orders of this Court.

## COUNT II – VIOLATION OF THE REHABILITATION ACT

110.  Paragraphs 1 through 90, 92 through 107 are realleged and incorporated as if fully set forth herein.

111.  Pursuant to 42 U.S.C. § 2000d-7(a)(1), "[a] state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . , or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."

112.  Section 2000d-7 unambiguously conditions the receipt of federal funds on the waiver of Eleventh Amendment immunity to claims under section 504 of the Rehabilitation Act.

113.  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits discrimination against people with disabilities by recipients of federal funding, and provides that "no otherwise qualified handicapped individual … shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

114.  HOBBS is otherwise qualified under the Rehabilitation Act because he meets the essential eligibility requirements to participate in the Defendants' services, programs, and activities.

115.  Under Section 504 of the Rehabilitation Act, no otherwise qualified individual with a disability in the United States, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

116.  Because they are a recipient of federal financial assistance, the Defendants are subject to the requirements of the Rehabilitation Act, and it's implementing regulations.

117.  FBBE's actions, or omissions to act, described above violated HOBBS' rights under the Rehabilitation Act by discriminating against him on the basis of a disability.

118.  FBBE's discriminatory conduct against Plaintiff was deliberate and intentional, and/or in reckless disregard of HOBBS' rights.

119.  HOBBS has suffered damages due to the Defendants' violations of the Rehabilitation Act.

120.  HOBBS has been obligated to retain the undersigned counsel for the filing and prosecution of this action and is entitled to recover those attorney fees, expert fees, costs and expenses incurred in this case from the Defendants pursuant to 29 U.S.C. § 794(b).

**WHEREFORE**, Plaintiff, JULIUS HOBBS, respectfully demands judgment against Defendants, THE FLORIDA SUPREME COURT, the FLORIDA BOARD OF BAR EXAMINERS ("FBBE") and MICHELLE A. GAVAGNI, in her official capacity as Executive Director of the Florida Board of Bar Examiners, for following injunctive relief:

A.  Finding that Questions 25 and 26 are unlawful eligibility bars based on disability and Ordering Defendants to cease asking this information solely based on a history of disability instead of conduct that would demonstrate unfitness to practice law;

B.  Finding that the practices relating to the investigation of persons' disabilities is an unlawful eligibility bar, and Ordering Defendants to cease demanding detailed medical documentation of an applicant's psychiatric history, subjecting applicants, who may or may not have their own treating professional, to additional psychiatric examinations, or subject applicants to interrogation at a hearing by the FBBE regarding their mental health.

C.  Finding that the practices subjecting persons with disabilities to additional costs solely because of their disability status, such as costs of investigations, examinations, hearings, and conditional admissions, are discriminatory surcharges based on disability, and ordering defendants to cease surcharging applicants and attorneys because of their disability status.

D.  Finding that HOBBS history of alcohol abuse and mental illness places him at risk for conditional admission, and find that the Defendants' practices regarding conditional admission place unlawful and discriminatory eligibility conditions upon a person with a disabilities right to practice.

A.  Awarding HOBBS compensatory damages from the Florida Supreme Court and the Florida Board of Bar Examiners for the intentional deprivation of his rights.

B.  Awarding HOBBS his reasonable costs and attorneys' fees;

C.  Awarding such other relief the Court deems proper; and

D.  Retaining jurisdiction of this case until the Department has fully complied with the orders of this Court.

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ISSUES FOR WHICH A TRIAL BY JURY IS PERMITTED.**

Dated this 20th day of September 2017.

DISABILITY INDEPENDENCE GROUP, INC.
2990 Southwest 35th Avenue
Miami, Florida 33133
Telephone: (305) 669-2822
Facsimile: (305) 442-4181

By:  s/___*Matthew W. Dietz*_____
        Matthew W. Dietz, Esq.
        Florida Bar No. 84905
        Lisa C. Goodman, Esq.
        Florida Bar No. 118698